# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

IN RE: DEEPWATER HORIZON
BELO CASES

**Case No. 3:19-cv-963**

This Document Relates to:

Judge M. Casey Rodgers
Magistrate Judge Gary R. Jones

*Kenneth Davenport,* 5:18-cv-00245
*Lester Jenkins,* 5:19-cv-00260
*Michael Moulder,* 5:19-cv-00012
*Dwight Siples,* 5:19-00310

---

## BP'S[1] MOTION AND MEMORANDUM TO EXCLUDE THE OPINIONS OF DR. MICHAEL FREEMAN; AND REQUEST FOR ORAL ARGUMENT

BP moves this Court to exclude the opinions of Plaintiffs' epidemiologist, Dr. Michael Freeman, pursuant to Fed. R. Evid. 702 because (i) he fails to use reliable methods in his attempt to prove a statistically significant association and (ii) his opinions are not helpful to the trier of fact because he does not even attempt to perform any of the three "indispensable" methods of proving a cause-effect relationship. There is nothing reliable or helpful about Dr. Freeman's opinions and they should be excluded under Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

---

[1]     Defendants BP Exploration & Production Inc. and BP America Production Company (collectively, "BP") file this Motion and Memorandum to Exclude the Opinions of Dr. Michael Freeman pursuant to Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Because this is the second round of *Daubert* briefing in this BELO docket, the requirements of an admissible expert's general causation opinion have already been spelled out. *See In re Deepwater Horizon BELO Cases*, No. 19-963, 2020 WL 6689212 (N.D. Fla. Nov. 4, 2020), *aff'd*, *In re Deepwater Horizon BELO Cases*, No. 20-14544, 2022 WL 104243 (11th Cir. Jan. 11, 2022). They include:

- A need to identify relevant statistical associations in the epidemiological literature (*id*. at *13);

- A need to evaluate the limitations and biases of the epidemiological studies relied upon (*id*. at *13);

- A need to provide a reasoned analysis of the Bradford Hill factors such as alternative causes and the dose-response relationship (*id*. at *16);

- A need to determine the exposure level known to cause the plaintiffs' injuries (*id*. at *16); and

- A need to review the exposure data from the oil spill to determine whether the plaintiffs were potentially exposed to levels of toxins known to cause harm (*id*. at *17).

Dr. Freeman provides none of this information. Consequently, BP requests that this Court find Dr. Freeman's opinions are unreliable, unhelpful, and therefore, inadmissible.

## BACKGROUND

A full recitation of the docket history is unnecessary as this Court has addressed that subject in prior orders.[2]

### I. These Test Plaintiffs

Oil spill clean-up workers Lester Jenkins, Dwight Siples, Michael Moulder and Kenneth Davenport are the four test Plaintiffs who retained Dr. Freeman. Both Jenkins and Siples complain of chronic sinusitis.[3] Moulder and Davenport complain of chronic conjunctivitis.[4]

### II. Summary of Dr. Freeman's Reports and Opinions

Dr. Freeman is an epidemiologist who authored two reports in these test cases – one for Plaintiffs claiming chronic conjunctivitis (Moulder and Davenport), and the other for Plaintiffs claiming chronic rhinosinusitis (Jenkins and Siples). Those reports are attached hereto as Exhibits A and B, respectively. Dr. Freeman was also deposed over two days about those reports. The transcript is attached hereto as Exhibit C.

---

[2]    *See, e.g.,* R. Docs. 52, 167, 333, 342.

[3]    *See* R. Doc. 348 (Oct. 13, 2021, Case Management Order).  The plaintiffs' allegations are spelled out in their Complaints.  *See Jenkins v. BP Expl. & Prod.*, No. 5:19-cv-260; *Siples v. BP Expl. & Prod.*, No. 5:19-310.

[4]    *See* R. Doc. 348 (Oct. 13, 2021, Case Management Order).  The plaintiffs' allegations are spelled out in their Complaints.  *See Moulder v. BP Expl. & Prod.*, No. 5:19-cv-12; *Davenport v. BP Expl. & Prod.*, No. 5:18-cv-245.

Dr. Freeman opines that there is a "causal relationship" between chronic rhinosinusitis and chronic conjunctivitis, and unspecified "chemicals associated with the BP Deepwater Horizon oil spill":[5]

> **Conclusions**
> The results of my critical review of the relevant scientific and epidemiologic evidence support a general causal relationship between occupational exposure to chemicals associated the BP Deepwater Horizon oil spill and subsequent chronic rhinosinusitis.
>
> Based upon the adjusted hazard ratio for chronic sinusitis associated with crude oil inhalation, there is a minimum additional 55% risk attributable to the exposure, among those who have been exposed and have the condition.

> **Conclusions**
> The results of my critical review of the relevant scientific and epidemiologic evidence demonstrate a general causal relationship between occupational exposure to chemicals associated the BP Deepwater Horizon oil spill and subsequent chronic conjunctivitis and dry eye. The evidence indicates an association of least a 24% increased risk in the general population of exposed workers.

His reports – combined with his deposition testimony – clearly establish that his methodology is flawed and unreliable and does not meet Eleventh Circuit requirements for admissibility. Dr. Freeman's conclusions are compromised because his expert reports (a) fails to follow the guidance issued by this Court the first bellwether group, (b) fails to meet Eleventh Circuit requirements for an admissible opinion on general causation, (c) fails to comply with the Supreme Court's

---

[5]     Exhibit A, Freeman Rhinosinusitis Report; Exhibit B, Freeman Conjunctivitis Report.

prerequisites in *Daubert*, and (d) ultimately fails to satisfy the reliability or helpfulness requirements from of Rule 702 of the Federal Rules of Evidence.

## LEGAL REQUIREMENTS OF ADMISSIBLE CAUSATION OPINIONS

### III.   F.R.E. 702 and *Daubert* Requirements

Rule 702 of the Federal Rules of Evidence ("F.R.E.") governs the admissibility of expert testimony. The rule permits experts to offer opinions if (a) the expert's specialized knowledge will help the trier of fact, (b) the testimony is based on sufficient facts or data, (c) the testimony is the product of reliable principles and methods, and (d) the expert has reliably applied those principles and methods. "The admission of expert evidence is governed by Federal Rule of Evidence 702, as explained by *Daubert* and its progeny." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005).

According to the Supreme Court, to evaluate the reliability of the proposed testimony, courts must assess "whether the reasoning or methodology underlying the testimony is scientifically valid." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-94 (1993). The Eleventh Circuit considers a four-factor test for gauging the reliability of an expert's methodology under *Daubert*:

> (1) whether the methodology is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) whether the methodology has a known error rate; and (4) whether the technique has been generally accepted in the relevant scientific community.

*United Fire & Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1341 (11th Cir. 2013) (citing *Daubert*, 509 U.S. at 593-94); *U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (same). Application of the *Daubert* factors is mandatory, but the trial judge has leeway in her conclusion. *Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239, 1245 (11th Cir. 2018). The proponent of the expert bears the burden of establishing these criteria. *Id*.

Not only must an expert's opinions be reliable, they must also be helpful. F.R.E. 702(a); *Daubert*, 509 U.S. at 592. The helpfulness requirement means that the testimony is not only scientifically valid but also that the "reasoning or methodology [has been] properly . . . applied to the facts in issue." *Seamon v. Remington Arms Co.*, 813 F.3d 983, 988 (11th Cir. 2016).

## IV. Dr. Freeman Has Failed to Employ the Eleventh Circuit's Three "Indispensable" Methodologies for Reliability and Admissibility.

As this Court has noted, "[t]he Eleventh Circuit considers three 'primary' methodologies 'indispensable' for proving that a drug [or substance] can cause a specific adverse effect: **epidemiological studies**, **dose-response relationship**, and **background risk of disease**."[6] Dr. Freeman's opinions do not meet the Eleventh

---

[6]  *In Re: DWH BELO Cases,* Case No. 3:19cv963, 2020 WL 6689212, at *22 (N.D. Fl. Nov. 4, 2020)(citing *Chapman,* 766 F.3d at 1308)(emphasis added).

Circuit test for reliability and admissibility on the subject of general causation because he either ignores or misapplies all three "indispensable" methodologies.

Dr. Freeman's reports cite (i) summaries of select and unreliable cross-sectional studies documenting self-reported medical symptoms and (ii) studies involving other oil spills that are not relevant in these cases. Nowhere does he attempt to critically assess the studies by addressing the weaknesses of their design or the limitations of their findings. At the end of both reports, Dr. Freeman summarily concludes that each of the Bradford Hill criteria have been satisfied. His failure to properly implement any of these three methodologies renders his general causation opinions unreliable.

> **A.** **Dr. Freeman's Reports Contain No Meaningful Analysis or Critique of the Studies Cited in his Reports.**

The first of the Eleventh Circuit's three "indispensable" methodologies is "epidemiological studies." Epidemiology is the science that studies the incidence, distribution, and cause of disease in human populations.[7] It is "generally considered to be the best evidence of causation in toxic tort actions."[8]

---

[7]   Federal Judicial Center, *Reference Manual on Scientific Evidence* (3d ed. 2011) at 551. (Hereinafter, *"Ref. Man."*).

[8]   *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1198 (11th Cir. 2002), *cert. denied*, 546 U.S. 935 (2005)

While Dr. Freeman's reports reference certain epidemiological studies, their significance to his opinions is a mystery. His reports simply identify and copy language from the papers without articulating how they support his opinions on general causation or addressing how their designs and limitations impact their potential utility in evaluating and drawing conclusions regarding general causation in these test cases.

According to the *Reference Manual on Scientific Evidence*, Third Edition (hereinafter, "*Reference Manual*"),[9] when epidemiology is being used in litigation, "the methodological soundness of a study and its implications for resolution of the question of causation <u>must be assessed</u>."[10] Dr. Freeman's reports fail to do so. His approach is scientifically unacceptable. All epidemiological studies have inherent flaws, to a varying degree.[11] For that reason, when "evaluating epidemiologic evidence, <u>the key questions</u>, then, are the extent to which a study's limitations compromise its findings and permit inferences about causation."[12]

Nowhere in Dr. Freeman's reports does he attempt to 'show his work' regarding any criticisms of a study's design or limitations that can be drawn from

---

[9]    *See, e.g., In re Abilify*, 299 F. Supp. 3d at 1306–07.

[10]   *Ref. Man.* at 554 (emphasis added).

[11]   *Id.* at 553.

[12]   *Id.*

them.[13]  That is because Dr. Freeman does not believe a study's design impacts his ability to extrapolate the study to indicate cause and effect.[14]

### 1. Dr. Freeman improperly relies on studies based on symptoms rather than the diagnosed chronic conditions alleged in these cases.

Importantly, all of the studies Freeman cited evaluate the incidence of medical symptoms and not clinically diagnosed conditions or diseases.[15] Symptoms are not the same as diagnosed conditions and generic symptoms are not at issue in these cases. Freeman fails to discuss this important limitation of these studies cited in his report even though he recognizes the distinction.[16] Freeman fails to explain how the cited epidemiological studies involving symptomology reliably support his

---

[13]   Exhibit C, Freeman Deposition; 142:14-21 (Conceding the NIOSH study specifically states the data should not be used for long-term or chronic health effects); Exhibit C, Freeman Deposition; 157:4-11 (Conceding the Interim Reports state they could not be used to demonstrate causation); *see also* Exhibit C, Freeman Deposition; 204:22-206:6 (No analysis of 2018 D'Andrea study in reports); *see also* Exhibit C, Freeman Deposition 230:17 – 232:1 (No analysis of 2018 Rusiecki study design in reports).

[14]   Exhibit C, Freeman Deposition (Feb. 8, 2022); at pp. 182:11-184:18. Exhibit C, Freeman Deposition; 219:16- 220:10 (McGowan does not include any pre-DWH health information); Exhibit C, Freeman Deposition; 285:25–287:1 (Omoti using people seeking eye care as subjects in a study regarding eye conditions is not a limitation); Exhibit C, Freeman Deposition; 189:5-190:5 (D'Andrea 2013 using Plaintiffs suing BP in personal injury suits is not a limitation).

[15]   *See* Exhibit C, Freeman Deposition; 140:5-8 (NIOSH data looked at acute health effects, not chronic); *see also* Exhibit C, Freeman Deposition; 193:5-19 (2013 D'Andrea only looked at acute health effects); *see also* Exhibit C, Freeman Deposition; 222:2 - 12 (McGowan does not address chronic conjunctivitis or chronic rhinosinusitis);

[16]   Exhibit C, Freeman Deposition; 227:20 – 228:2; 158:13-20.

conclusions as to general causation of chronic conjunctivitis or chronic rhinosinusitis. [17]

In addition, his reports cite studies in which the participants' symptomology was self-reported,[18] and where participants were plaintiffs asserting claims[19] for injuries related to the *Deepwater Horizon* spill response. Dr. Freeman makes no attempt to discuss how either of these design limitations could impact the studies' reliability for purposes assessing or drawing conclusions regarding general causation.

### 2. Dr. Freeman relies on cross-sectional studies that are "rarely useful" in assessing general causation.

Dr. Freeman's reports reference epidemiological studies that fall into two categories: cross-sectional studies related to the *Deepwater Horizon* oil spill[20] and

---

[17]   *See* Exhibit C, Freeman Deposition; 287:12-288:12; 289:25-290:7; 300:2-17 (NIOSH data synthesized into tables dealt only with self-reported physical symptoms); Exhibit C, Freeman Deposition; 213:2-6 (McGowan dealt only with physical symptoms); Exhibit C, Freeman Deposition; 214:6-17 (McGowan focuses on symptoms); Exhibit C, Freeman Deposition; 231:18-232:1 (2018 Rusiecki focuses on symptoms).

[18]   Exhibit C, Freeman Deposition; 287:12-288:12; 289:25-290:7; 300:2-17 (NIOSH data synthesized into tables dealt only with self-reported physical symptoms).

[19]   Exhibit C, Freeman Deposition; 189:5-190:5 (D'Andrea 2013 used Plaintiffs in personal injury suits as the subjects in their study).

[20]   Exhibit C, Freeman Deposition; 164:5-20 (NIOSH data reduced to tables would be cross-sectional in nature, and no causal inference can be made); Exhibit C, Freeman Deposition; 181:8 – 182:14 (D'Andrea 2013 is cross-sectional); Exhibit C, Freeman Deposition; 185:11 – 186:5 (Because D'Andrea 2013 is cross-sectional design, cannot infer causality); Exhibit C, Freeman Deposition; 211:19 – 212:16 (McGowan is cross-sectional study with limits on use to show causality); Exhibit C, Freeman Deposition; 238:3-8 (discussing the component of the Rusiecki 2018 used by Freeman in his report is cross-sectional in design and cannot determine temporality of exposure and acute health effects); Exhibit C,

those involving other oil spills (or other types of exposures generally).[21] According to the *Reference Manual on Scientific Evidence*, when epidemiology is being used in litigation, "the methodological soundness of a study and its implications for resolution of the question of causation must be assessed."[22] Dr. Freeman's reports fail to do so.

The quality of epidemiological studies varies. Some of that variance is due to a study's design. Cohort and case control studies are the most useful for purposes of general causation.[23] Descriptive epidemiological studies – such as cross-sectional studies – are less helpful.[24] According to the *Reference Manual,* "cross-sectional studies are rarely useful in identifying toxic agents,"[25] and "[c]ross-sectional studies are infrequently used when the exposure of interest is an

---

Freeman Deposition; 245:19 – 251:20 (Component of the Rusiecki 2021 used by Freeman in his report is cross-sectional).

[21] Exhibit C, Freeman Deposition; 271:9-18 (Na related to Hebei Spirit oil spill); see also Exhibit C, Freeman Deposition; 265:266:4 (Freeman doesn't know the composition of the oil which was released in the Hebei oil spill, despite using it to find an association to health conditions in DWH); Exhibit C, Freeman Deposition; 262:20 – 263:5 (Amor Carro used rats and Prestige oil spill chemical composition); Exhibit C, Freeman Deposition; 278:6-279:18 (Awoyesuku on Rivers State Crude oil spill); Exhibit C, Freeman Deposition; 279:11-13 (Awoyesuku is cross-sectional); Exhibit C, Freeman Deposition; 281:19 – 282:3 (Awoyesuku regarding "toxic refinery chemicals" which are different than chemicals in DWH); Exhibit C, Freeman Deposition; 282:6 -283:18 (Omoti on Ocular Disorders is regarding petroleum refinery chemicals which are different than chemicals in DWH).

[22] *Ref. Man.* at 554 (emphasis added).

[23] *Ref. Man.* at 556-61.

[24] *Ref. Man.* at 556-61.

[25] *Ref. Man.* at 556.

environmental toxic agent."[26] Cross-sectional studies are not used because "both exposure and disease are determined in an individual at the same point in time," and therefore, "it is not possible to establish the temporal relation between exposure and disease' from this type of study."[27]

At deposition, Dr. Freeman rejected this well-established limitation with cross-sectional studies and instead posed an unrelated hypothetical to justify his reliance on them:[28]

Q    Because you don't have the temporal component in a cross-sectional study or a prevalence study, is that why you couldn't use those studies to establish causation between an exposure and a disease because you don't have the temporal component?

A    Well, you can assume a temporal component, a precedent temporal component, based on the nature of the exposure.  But for discrete exposures, yes, I agree.  That makes it much more difficult to make such a determination.

And -- and that is, for example, if you just did a -- a cross-sectional study of people with lung cancer, and -- and you also looked at whether they smoked, in -- in all cases, they smoked -- in virtually all cases, they smoked before they got the lung cancer.

So there are some assumptions that you can make, but it -- that's rare.  And who is doing that

---

[26]    *Id.* at 561.   Among other reasons for this limitation, cross-sectional studies, by design, cannot be used to demonstrate a cause-and-effect relationship.  *Id.* at 560-61.

[27]    *In Re: DWH BELO Cases,* Case No. 3:19cv963, 2020 WL 6689212, at FN30 (N.D. Fl. Nov. 4, 2020) (citing *Ref. Man.*at 560).

[28]    Exhibit C, Freeman Deposition; 118:5-22.

This Court has previously cautioned that cross-sectional studies cannot establish the necessary temporal relationship between exposure and disease.[29]

### a. The cross-sectional studies related to *Deepwater Horizon* are inherently flawed.

In his chronic conjunctivitis report, Dr. Freeman states there are no studies of the health effects among DWH that directly assess conjunctivitis.[30] Notwithstanding, he references NIOSH data and the McGowan GuLF study to support his conclusions regarding general causation. There are several problems with Dr. Freeman's reliance on these publications.

The authors of the NIOSH data cautioned that the information should not be extrapolated to long term or chronic health effects, but Dr. Freeman's report does

---

[29]   *In Re: DWH BELO Cases,* Case No. 3:19cv963, 2020 WL 6689212, at FN30 (N.D. Fl. Nov. 4, 2020) (citing *Ref. Man.*at 560).

[30]   Exhibit B Conjunctivitis Report, p. 22; Exhibit A Rhinosinusitis Report, p. 21.

just that.[31] Second, the study only dealt with self-reported symptoms, not formal diagnoses.[32] And finally, the study's design was cross-sectional.[33]

In the McGowan GuLF study, which is also cross-sectional, the exposure and health outcomes were self-reported. This can lead to measurement error and recall bias that nullifies its findings and do not allow for conclusions regarding causation.[34]

Dr. Freeman cites to several additional studies involving *Deepwater Horizon* response workers in his chronic rhinosinusitis report, including the D'Andrea studies and the Rusiecki studies.

---

[31]   Exhibit B Conjunctivitis Report, p. 22; Exhibit C Deposition; 142:14-21 (NIOSH data specifically states the data should not be used for long-term or chronic health effects); Exhibit F Dr. Dominik Alexander Report - Rhinosinusitis Plaintiff, p. 50 ("He cites to his own analysis of the publicly available NIOSH dataset. However, these are self-reported data using a cross-sectional design with no statistical adjustments for confounding factors. This analysis provides no reliable or credible evidence to determine risk of chronic symptoms or conditions.").

[32]   Exhibit C Deposition; 287:12-288:12; 289:25-290:7; 300:2-17 (NIOSH data synthesized into tables dealt only with self-reported physical symptoms); Exhibit D Dr. Alexander Report - Conjunctivitis Plaintiff, p. 43 ("Furthermore, his analysis is cross-sectional and thus, is neither designed nor suitable to address matters of causation.")

[33]   Exhibit D Dr. Alexander Report - Conjunctivitis Plaintiff, p. 45 ("He cites to his own analysis of the publicly available NIOSH dataset. However, these are self-reported data using a cross-sectional design with no statistical adjustments for confounding factors. This analysis provides no reliable or credible evidence to determine risk of chronic symptoms or conditions.").

[34]   Exhibit E, Declaration of Dr. Dominik Alexander, at ¶ 5(d); *See also* Exhibit D Dr. Alexander Report - Conjunctivitis Plaintiff, p. 45 ("However, he provides cross-sectional prevalence statistics, which are not used for general causation assessments. Furthermore, the author of this study expressed methodological and analytical limitations, which I have summarized throughout my report.").

The D'Andrea studies were cross-sectional and limited due to small sample size.[35] Furthermore, findings from these studies were hampered by lack of pre-spill baseline health information for participants and limited information on confounding factors, such as smoking history, pre-existing health conditions and body composition.[36] Moreover, the study participants included workers referred for medical evaluation by their attorneys making selection bias a prominent concern.[37] The Rusiecki study is also rife with limitations.[38] The limitations include their cross-sectional design, self-reported health outcomes, recall bias, and the inclusion of confounding factors.[39]

In summary, Dr. Freeman's reports wholly failed to provide analysis on the impacts of the various limitations of the *Deepwater Horizon* response worker

---

[35]   Exhibit C Deposition; 301:8-17; *See also* Exhibit F Dr. Alexander Report - Rhinosinusitis Plaintiff, p. 50 ("He cites the D'Andrea studies, which included a non-representative small sample of workers who were referred to the study by plaintiffs' attorneys. The methodology of the D'Andrea studies were criticized by two independent research groups."); *see also* Exhibit F Dr. Alexander Report - Rhinosinusitis Plaintiff, p. 29.

[36]   *Id.*

[37]   *Id.*; *see also* 189:5-190:5 (D'Andrea 2013 study using Plaintiffs suing BP in personal injury suits is not a limitation).

[38]   Exhibit F Dr. Alexander Report - Rhinosinusitis Plaintiff, p. 45 ("However, as I have explained *ad nauseum* in this report, the totality of the analyses from this study are not supportive of independent association between oil exposure and/or work as a responder and risk of chronic sinusitis.").

[39]   Exhibit C Deposition; 238:3-8 (discussing the component of the Rusiecki 2018 used by Freeman in his report is cross-sectional in design and cannot determine temporality of exposure and acute health effects); Exhibit C Deposition; 245:19 – 251:20 (Component of the Rusiecki 2021 used by Freeman in his report is cross-sectional).*See also* Exhibit F Dr. Alexander Report - Rhinosinusitis Plaintiff, p. 21.

studies. Due to the cross-sectional nature of the studies and numerous design limitations, the studies are flawed and cannot be relied upon to prove causation.

### b. The cross-sectional studies related to other oil spills are equally unreliable.

In his chronic conjunctivitis report, Dr. Freeman cites to a study regarding the *Hebei Spirit* oil spill in South Korea. At deposition, Freeman was unable to explain how that spill related to or differed from the *Deepwater Horizon* spill in terms of the chemical composition of the oil involved or the potential exposures of individuals.[40] He also disagreed that the location of an oil spill (e.g., 5 miles or 100 miles off shore) is an important fact for purposes of assessing the relevance of a study:[41]

---

[40]    Exhibit C, Freeman Deposition; 265:13-18.

[41]    Exhibit C, Freeman Deposition; 266:13-24.

```
A    When you say "does it matter" --
Q    Well, does it impact your opinions as to an
oil spill that's five miles offshore versus an oil
spill that's 100 miles offshore --
A    No.
Q    -- in assessing general causation?
A    If the oil could get to the shore, then no,
it doesn't matter where it started.  For my purposes,
if people were cleaning up oil on the shore, and
there's tar balls there from the oil, regardless if it
started five feet off the shore or 500 miles off the
shore, that -- that doesn't make any difference.
```

As BP's toxicology expert Dr. Robert Cox stated, the location of the DWH spill and corresponding effects of oil weathering are significant factors to consider when attempting to use studies from other spills to assess general causation.[42] Dr. Freeman, however, does not account for these important distinctions.

Further, when asked whether he considered the types of response activities the participants in the *Hebei Spirit* study performed compared to these Plaintiffs, Freeman didn't know the answer and stated: [43]

```
A    I would have to go back into the study to see
to what degree those activities were described.
```

---

[42]    Exhibit G, Declaration of Dr. Robert Cox, Exhibit A to Declaration Dr. Robert Cox Report (Dec. 20, 2021), at p.81.

[43]    Exhibit C, Freeman Deposition, February 9, 2022; 267:20-21.

Freeman's report on chronic conjunctivitis, which is the only one that cites to the *Hebei Spirit* study, does not explain how that study establishes any statistically significant association that is relevant here.

Further, the other studies cited in his reports are equally flawed for various reasons: they involve an unrelated oil spill and exposure scenario, they are insufficient by design to establish causation, and they involve different health outcomes than the chronic conditions at issue here.[44]

### 3. Freeman failed to provide any epidemiological studies that establishes general causation.

Freeman's reports do not explain whether or how the epidemiological studies he cites establish any statistical association between exposure any specific toxin(s) and the two LMPCs at issue. Freeman states in both reports "a relative risk of >2.0 implies that the exposure of interest caused the condition"[45] but then uses statistically

---

[44] Exhibit C Freeman Deposition, February 9, 2022; 271:9-18 (Na study related to Hebei Spirit oil spill); see also Exhibit C Freeman Deposition, February 9, 2022; 265:266:4 (Freeman doesn't know the composition of the oil which was released in the Hebei oil spill, despite using it to find an association to health conditions in DWH); Exhibit C Freeman Deposition February 9, 2022; 262:20 – 263:5 (Amor Carro study used rats and Prestige oil spill chemical composition); Exhibit C Freeman Deposition, February 9, 2022; 278:6-279:18 (Awoyesuku study on Rivers State Crude oil spill); Exhibit C Freeman Deposition, February 9, 2022; 279:11-13 (Awoyesuku study is cross-sectional); Exhibit C Freeman Deposition, February 9, 2022; 281:19 – 282:3 (Awoyesuku study regarding "toxic refinery chemicals" which are different than chemicals in DWH); Exhibit C Freeman Deposition, February 9, 2022; 282:6 -283:18 (Omoti study on Ocular Disorders is regarding petroleum refinery chemicals which are different than chemicals in DWH).

[45] Exhibit B, Conjunctivitis Report, p. 9; *see also* Exhibit A, Rhinosinusitis Report, p. 9.

insignificant relative risks below 2.0 to support his opinions finding an association. Freeman's reluctance to adhere to established scientific principles and protocols related to epidemiology underscores the unreliability of his opinions.

In the chronic rhinosinusitis report, Freeman includes several pages of information from NIOSH and concludes "[t]he difference for itchy eyes and nose irritation, sinus problems, or sore throat did not reach statistical significance. . ."[46] Freeman did not include a statement about his finding of any statistically significant association between toxic exposure to a particular chemical or substance and the development of chronic rhinosinusitis. Instead, he stated: [47]

> 2.40; 95% CI 1.81, 3.20) than those without the given exposure. Although "dose-response" relationships were also seen for sinus problems and exposure to tar balls and dust, results of Chi-square test for trend were only statistically significant for dust exposures ($P=0.01$). Notably, 18.0% of shoreline worker that reported any exposure to dripping oil, tar balls, dispersant, or dust also reported sinus problems while only 4.7% of those that indicated no exposure to any of the 4 reported sinus problems (OR, 4.46; 95% CI 2.57, 8.37). These findings are very strong evidence for an association between exposure

In the excerpt above, Freeman clearly states that there is no dose-response relationship for sinus problems resulting from exposure to tar balls, dripping oil or dispersants that were statistically significant.[48] Notably, the generic self-reported symptom of "sinus problems" is not the same as "chronic rhinosinusitis," and that the non-existent dose-response relationship mentioned by Freeman does not identify

---

[46]     Exhibit A, Rhinosinusitis Report., p. 14.

[47]     Exhibit A, Rhinosinusitis Report., p. 17.

[48]     *Id.*

any measurable dose or toxin. Again, Freeman has attempted to create an *ipse dixit* association, but wholly fails address the actual conditions at issue in these cases.

Then, in his purported "Application of the Hill Criteria to the Evidence to the Cause of CRS among BPDWH Responders" *strength of association* section, Freeman opines as follows: [49]

*Application of the Hill Criteria to the evidence to the cause of CRS among BPDWH responders*

1.   *Strength of association*
   ➢ The above analysis demonstrated abundant evidence that demonstrated substantial statistically significant associations between exposure to products of the BPDWH oil spill and sinusitis and chronic rhinosinusitis:
      ○ My analysis of NIOSH data revealed that 18.0% of shoreline workers that reported any exposure to dripping oil, tar balls, dispersant, or dust also reported sinus problems while only 4.7% of those that indicated no exposure to any of the 4 reported sinus problems (**OR 4.46**; 95% CI 2.57, 8.37).
      ○ The 7-year follow-up study of D'Andrea and Reddy showed that **91%** of the oil spill exposed subjects had developed chronic rhinosinusitis compared to none at baseline.
      ○ The 5-year follow-up results from the Deepwater Horizon Oil Spill Coast Guard Cohort demonstrated responders reporting exposure to crude oil via inhalation had elevated risks for all sinusitis (aHR, 1.48; 95% CI 1.06, 2.06) and unspecified chronic sinusitis (aHR, **1.55**; 95% CI 1.08, 2.22).[25]

The above excerpt cites three specific sources of data (NIOSH, D'Andrea paper, and the Coast Guard study) that Freeman wrongly suggests "demonstrate[] substantial statistically significant association." With respect to the NIOSH data, even though the authors expressly cautioned that the information should not be extrapolated to long term or chronic health effects, Freeman's report does just that.[50]

---

[49]   Exhibit A, Rhinosinusitis Report., p. 21.

[50]   Exhibit C, Freeman Deposition; 142:14-21 (NIOSH data specifically states the data should not be used for long-term or chronic health effects); Exhibit F, Dr. Dominik Alexander Report - Rhinosinusitis Plaintiff, p. 50 ("He cites to his own analysis of the publicly

This study only dealt with self-reported symptoms, not actual diagnosed conditions.[51] And most importantly, Freeman conceded that it did not establish any statistical significance association according to the principles of epidemiology:[52]

```
So there was no statistical significance that
you could determine from this analysis; is that
correct?
    A    The only thing that was statistically
significant was headaches and the itchy skin, red
skin.  So the two things I mentioned, correct.  They
were not statistically significant.
```

Second, neither the D'Andrea paper nor Freeman assigned an actual relative risk figure to the study results. This is likely because the D'Andrea study was cross-sectional and only included 44 respondents.[53] Because D'Andrea did not compare the 44 respondents to an unexposed group or provide a relative risk, the study cannot be used to evaluate or establish causation.

---

available NIOSH dataset. However, these are self-reported data using a cross-sectional design with no statistical adjustments for confounding factors. This analysis provides no reliable or credible evidence to determine risk of chronic symptoms or conditions.").

[51]   *Id.* at p. 287:12-288:12; 289:25-290:7; 300:2-17 (NIOSH data synthesized into tables dealt only with self-reported physical symptoms); Exhibit F Dr. Alexander Report - Rhinosinusitis Plaintiff, p. 48-49 ("Furthermore, his analysis is cross-sectional and thus, is neither designed nor suitable to address matters of causation.")

[52]   *Id.* at p. 291:13-19.

[53]   *Id.* at p. 301:8-17; Exhibit F Dr. Alexander Report - Rhinosinusitis Plaintiff, p. 50 ("He cites the D'Andrea studies, which included a non-representative small sample of workers who were referred to the study by plaintiffs' attorneys. The methodology of the D'Andrea studies were criticized by two independent research groups.")

Finally, the 2021 Rusiecki "5-year follow-up" study provides that none of the relative risk numbers reached 2.0. Freeman acknowledged this at deposition: [54]

```
Q    Would you agree with me that Table 2 would
demonstrate that there is no real causal nexus between
exposure suffered by responders and the respiratory
conditions listed in Table 2 when compared to the
nonresponders?
     A    Yes.
     Q    And if we'd flip to Table 3, which is a
couple of pages over.
          Would you agree that Table 3 is looking at
```

```
just the responders, but they're breaking it down into
exposure oil ever versus oil never?  Is that what
Table 3 is examining?
     A    Yes.
     Q    And would you agree with me that for chronic
respiratory conditions, chronic rhinitis, chronic
sinusitis, unspecified chronic sinusitis, and allergic
rhinitis, that the study concludes that there was no
difference in terms of health risk for persons or
responders with oil ever exposure versus oil never
exposure?
     A    Yes.
```

---

[54]    *Id.* at pp. 244:17 – 245:12; Exhibit F Dr. Alexander Report - Rhinosinusitis Plaintiff, p. 45 ("However, as I have explained *ad nauseum* in this report, the totality of the analyses from this study are not supportive of independent association between oil exposure and/or work as a responder and risk of chronic sinusitis.").

In sum, none of the three studies Freeman cites in the "strength of association" section of his report reach the minimum level of statistical significance that he identified in his report, and thus, as it pertains to chronic rhinosinusitis, his opinions should be excluded on that basis alone.

Similarly, in both his chronic conjunctivitis report and his deposition, Dr. Freeman states there are no studies of the health effects among DWH that directly assess conjunctivitis:[55]

```
    Q   Is it fair to say that none of the Deepwater
Horizon studies that you reviewed specifically
mentioned chronic conjunctivitis as a health condition
that they were reporting on?
    A   That was diagnosed.  That's correct.
```

Then, he cites two papers (NIOSH and the GuLF Study) in support of "strength of association":[56]

---

[55]    Exhibit C Freeman Deposition; 301:24 – 303:16; Exhibit B, Conjunctivitis Report, p. 22.

[56]    Exhibit B, Conjunctivitis Report, p. 25.

> *Application of the Hill Criteria to the evidence to the cause of chronic conjunctivitis among BPDWH responders*
>
> 1. *Strength of association*
>    - ➢ The above analysis demonstrated abundant evidence that demonstrated substantial statistically significant associations between exposure to products of the BPDWH oil spill and ocular problems including chronic conjunctivitis:
>      - ○ My analysis of NIOSH data revealed that 16.4% of shoreline workers that reported any exposure to dripping oil, tar balls, dispersant, or dust also reported eye redness or itching while only 2.7% of those that indicated no exposure to any of those agents reported eye redness or itching (**OR 7.16**; 95% CI 3.53, 16.91).
>      - ○ The GuLF STUDY demonstrated that exposure to the dispersant agents following the BPDWH oil spill was associated significantly higher prevalence ratios for itching and burning eyes both at the time of cleanup [(aPR, 1.35; 95% CI 1.24, 1.46) and (aPR, 1.48; 95% CI 1.35, 1.64), respectively] and at enrollment one to 3 years later [(aPR, 1.24; 95% CI 1.12, 1.36) and (aPR, **1.44**; 95% CI 1.28, 1.61), respectively].

As previously stated, the authors of the NIOSH paper stated that the information should not be extrapolated to long term or chronic health effects;[57] it dealt only with self-reported symptoms not formal diagnoses;[58] and Freeman conceded there were no statistically significant findings regarding conjunctivitis: [59]

As to the McGowan GuLF study, all of the relative risks the author provides are below 2.0, that is, according to epidemiological standards and Freeman's own

---

[57]   Exhibit C, Freeman Deposition at p. 142:14-21 (NIOSH data specifically states the data should not be used for long-term or chronic health effects); Exhibit D, Dr. Dominik Alexander Report - Conjunctivitis Plaintiff, p. 45 ("He cites to his own analysis of the publicly available NIOSH dataset. However, these are self-reported data using a cross-sectional design with no statistical adjustments for confounding factors. This analysis provides no reliable or credible evidence to determine risk of chronic symptoms or conditions.").

[58]   *Id.* at pp. 287:12-288:12; 289:25-290:7; 300:2-17 (NIOSH data synthesized into tables dealt only with self-reported physical symptoms); Exhibit D, Dr. Dominik Alexander Report - Conjunctivitis Plaintiff, p. 43 ("Furthermore, his analysis is cross-sectional and thus, is neither designed nor suitable to address matters of causation.")

[59]   *Id.* at p. 291:13-19.

report, they *cannot* be used to establish causation.[60] Freeman conceded that the relative risk between exposure and chronic conjunctivitis does not exceed 2.0.[61] Accordingly, Freeman's general causation opinions as to chronic conjunctivitis should be excluded.

As previously stated by this Court, "in the absence of a statistical association supported by an epidemiologic study, "secondary" evidence, even within the Bradford Hill factors, such as biological plausibility, case studies, adverse event reports, animal and *in vitro* studies, standing alone or in the aggregate, are 'insufficient proof of general causation.'"[62] Even if "secondary evidence" was sufficient to prove general causation, Freeman has failed to reliably provide an analysis of the Bradford Hill criteria.[63] At the end of both of his reports, he enumerates the nine criteria and provides short paragraphs corresponding to each, with *ipse dixit* or self-serving statements concluding general causation exists for both chronic conjunctivitis and chronic rhinosinusitis.

---

[60]    Exhibit D, Dr. Dominik Alexander Report - Conjunctivitis Plaintiff, p. 45 ("However, he provides cross-sectional prevalence statistics, which are not used for general causation assessments. Furthermore, the author of this study expressed methodological and analytical limitations, which I have summarized throughout my report.")

[61]    Exhibit C, Freeman Deposition; 301:24 – 303:16.

[62]    *In Re: DWH BELO Cases,* Case No. 3:19cv963, 2020 WL 6689212, at 31 (N.D. Fl. Nov. 4, 2020)(citing *Chapman,* 766 F.3d at 1308).

[63]    Exhibit C, Freeman Deposition, at pp. 306:3 – 309:24; 309:25-312:10; 312:11– 313:9.

RE: *Chronic conjunctivitis plaintiffs v BP Production and BP America*

November 1, 2021

Page 26 of 26

7.  *Coherence*
    ➢ It certainly "makes sense" that exposure to inhaled irritants can cause ocular illnesses. [64]

RE: *Chronic rhinosinusitis plaintiffs v BP Production and BP America*

November 1, 2021

Page 22 of 23

3.  *Specificity*
    ➢ While not exclusive to environmental exposures, chronic upper respiratory disorders are closely related to the inhalation of environmental toxins (as described in the Reference Guide on Scientific Evidence, above). [65]

These two excerpts are representative of the manner in which Freeman purportedly assessed the Bradford Hill criteria in these cases. There was no analysis and only a conclusory statement. Freeman resorts to this tactic, in part, because he was unable to demonstrate any statistically significant association between exposure to any toxin and the development of chronic conjunctivitis or chronic rhinosinusitis.

**B. Freeman's Reports Do Not Consider or Include Analysis of Dose-**

---

[64]    Exhibit B, Conjunctivitis Report.

[65]    Exhibit A, Rhinosinusitis Report.

**Response Relationships.**

The second of the Eleventh Circuit's three "indispensable" methodologies for proving general causation is the "dose-response relationship."[66] "A 'dose-response relationship' exists when 'a change in amount, intensity, or duration of exposure to an agent is associated with a change—either an increase or decrease—in risk of disease.'"[67] The *Reference Manual* advises "all chemical agents are intrinsically hazardous—whether they cause harm is only a question of dose."[68] Colloquially, it is said, "the dose makes the poison."

This Court has stated that "[t]he Eleventh Circuit cautions that an expert who 'neglects this principle of toxic torts without justification casts suspicion on the reliability of his methodology,'"[69] and that "a reliable expert opinion on general causation should address what levels of exposure to a drug [or substance] increase the risk of adverse effects."[70]

---

[66]   *In re Abilify*, 299 F. Supp. 3d at 1306.

[67]   *In Re: DWH BELO Cases,* Case No. 3:19cv963, 2020 WL 6689212, at 31 (N.D. Fl. Nov. 4, 2020)(citing *McClain*, 401 F.3d at 1241–42.).

[68]   *Ref. Man.* at 636.

[69]   *In Re: DWH BELO Cases,* Case No. 3:19cv963, 2020 WL 6689212, at 31 (N.D. Fl. Nov. 4, 2020)(citing *McClain*, 401 F.3d at 1241–42.).

[70]   *In re Abilify*, 299 F. Supp. 3d at 1307-08.

Here, Freeman wholly fails to identify which chemicals he opines shows an association with either of the LMPCs at issue.[71] Additionally, Freeman is unable to provide any quantification or dose-response relationship:[72]

```
        MR. MCLEOD:   Q.   And would you also agree
with me that in your report, you couldn't point me to
a quantitative analysis of what exposure may have
occurred to anyone working in the Deepwater Horizon
cleanup work?   Is that also correct?
    A    Just if they were exposed to the shoreline
where the shoreline was contaminated.   But what they
were each specifically experiencing within the -- the
NIOSH data, for example, no, I do not have that
information described in my report.
```

This testimony demonstrates Freeman's opinion that just because a worker was employed in the response effort, and was "exposed to the shoreline," that this vague description satisfies the dose-response requirement in toxic tort cases and that any further quantification of dose-exposure is unnecessary. To be clear, it does not matter to Freeman whether a response worker worked a single day and never came into any contact with oil or dispersants, or if a response worker worked 100 days and was submersed in potential toxins. To Freeman, simply being near the shoreline is

---

[71] *See* Exhibit C, Freeman Deposition, at p. 134:12-134:25 (Freeman does not know the chemical composition of the oil released in DWH); *Id.* at pp. 136:10 - 137:16 (Freeman does not know the occupational limits regarding "permissible exposure levels"); *Id.* at pp. 54:14 – 55:3.

[72] *Id.* at pp. 91:23- 92:7.

sufficient to indicate a level of exposure considered to be "hazardous to human beings generally."[73]

This Court has stated, an expert opinion on general causation in the context of the BELO docket is "only helpful and a good 'fit' if it reliably shows 'general toxicity for the harm Plaintiffs allege and establishes an exposure level that is considered 'hazardous to human beings generally.'"[74] Simply put, Freeman's opinions should be excluded for failing to provide any quantifiable dose-response relationship.

### C. Freeman's Expert Reports Do Not Discuss Background Risk Whatsoever.

The last of the Eleventh Circuit's "indispensable" methodologies for proving general causation is "background risk of disease."[75] This "is the risk a plaintiff and other members of the general public have of suffering the disease or injury that plaintiff alleges *without* exposure to the drug or chemical in question."[76] An expert "must know the background prevalence of a disease before he can determine whether

---

[73]   Exhibit C, Freeman Deposition; 293:21-25.

[74]   *In Re: DWH BELO Cases,* Case No. 3:19cv963, 2020 WL 6689212, at 31 (N.D. Fl. Nov. 4, 2020)(citing *McClain*, 401 F.3d at 1239, 1241.).

[75]   *In re Abilify,* 299 F. Supp. 3d at 1306.

[76]   *McClain*, 401 F.3d at 1243 (emphasis added).

the risk of that disease is increased as a result of exposure to the agent."[77] Background risk establishes a baseline, without which "it is difficult to determine whether any incidence of disease in individuals exposed to an agent is anything more than a coincidence."[78]

As this Court recognized in the *Abilify* case: "A failure to identify or describe the background risk is a 'serious methodological deficiency' and 'substantial weakness' in an expert's general causation opinion."[79] Here, Freeman wholly fails to address background risk in his reports or testimony, and therefore, his opinions should be excluded.

## CONCLUSION

Dr. Freeman's purported general causation opinions do not meet the Eleventh Circuit test for reliability and admissibility because he either ignores or fails to properly apply the three "indispensable" methodologies in his reports. For the reasons described herein, Dr. Freeman's opinions fall far short of this standard, and should therefore be excluded.

## REQUEST FOR ORAL ARGUMENT

---

[77] *In re Abilify*, 299 F. Supp.3d at 1308 (*citing In re Denture Cream Products Liability Litig.*, 795 F. Supp.2d 1345, 1255 (S.D. Fla. 2011), *aff'd*, *Chapman*, 766 F.3d 1296).

[78] *Id.* (citing *Chapman*, 766 F.3d at 1308).

[79] *Id.*

Pursuant to Local Rule 7.1(K), Defendants request 1 hour for oral argument on this Motion.

**Certificate Pursuant to Rule 7.1(F)**

The undersigned certifies that this Motion contains 7,168 words.

Date: July 29, 2022                    Respectfully submitted,

                                        */s/ Francis M. McDonald, Jr.*
                                        FRANCIS M. MCDONALD, JR., ESQ.
                                        Florida Bar No. 0327093
                                        SARAH A. LONG, ESQ.
                                        Florida Bar No. 0080543
                                        MCDONALD TOOLE WIGGINS, P.A.
                                        111 N. Magnolia Avenue, Suite 1200
                                        Orlando, FL 32801
                                        Telephone: (407) 246-1800
                                        Facsimile: (407) 246-1895
                                        fmcdonald@mtwlegal.com
                                        slong@mtwlegal.com


                                        and

                                        KEVIN M. HODGES, ESQ.
                                        (*Admitted Pro Hac Vice*)
                                        WILLIAMS & CONNOLLY, LLP
                                        725 Twelfth Street, N.W.
                                        Washington, DC 20005
                                        Telephone: (202) 434-5221
                                        Facsimile: (202) 434-5029
                                        khodges@wc.com

                                        *Attorneys for Defendants, BP Exploration &*
                                        *Production Inc. & BP America Production*
                                        *Company*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 29, 2022, the foregoing was electronically

filed with the Clerk of Court via the CM/ECF system, which will send a notice of

electronic filing to the following counsel of record:

Charles David Durkee, Esq., Jason M. Larey, Esq., The Downs Law Group, P.A., 3250 Mary Street, Suite. 307 Coconut Grove, FL 33133, ddurkee@downslawgroup.com; jlarey@downs@downslawgroup.com (*Attorneys for Plaintiff*)

Adam J. Jagadich, Esq., *Admitted pro hac vice*, Maron Marvel Bradley Anderson & Tardy LLC, 30 S. Wacker Drive, Suite 3920, Chicago, IL 60606, ajagadich@maronmarvel.com (*Attorney for Defendants*)

Richard M. Crump, Esq., Christi G. Jones, Esq., *Admitted pro hac vice*, Chan E. McLeod, Esq., *Admitted pro hac vice* and Ericson W. Enger, Esq., *Admitted pro hac vice*, Stefan G. Bourn, Esq., *Admitted pro hac vice*, Kalleigh A. McCoy, Esq., *Admitted pro hac vice*, Cecilia Virden, Esq., *Admitted Pro Hac Vice*, Maron Marvel Bradley Anderson & Tardy LLC, 1020 Highland Colony Parkway, Suite 400, Ridgeland, MS 39157, rcrump@maronmarvel.com; cjones@maronmarvel.com; cmcleod@maronmarvel.com; eenger@maronmarvel.com; sbourn@maronmarvel.com; kmccoy@maronmarvel.com; cvirden@maronmarvel.com (*Attorneys for Defendants*)

Charles B. Wilmore, Esq., *Admitted pro hac vice,* Scott C. Seiler, Esq., *Admitted pro hac vice,* R. Keith Jarrett, Esq., *Admitted pro hac vice,* Devin C. Reid, Esq. *Admitted pro hac vice,* Liskow & Lewis, 701 Poydras Street, Suite 5000, New Orleans, LA 70139, cbwilmore@liskow.com; scseiler@liskow.com; rkjarrett@liskow.com; dcreid@liskow.com *(Attorneys for Defendants)*

Schuyler A. Smith, Esq., *Admitted pro hac vice* , Jamie Kainalu Nakoa, Esq., *Admitted pro hac vice,* Caitlin S. Clarke, Esq., *Admitted pro hac vice,* Bradley A. Silverman, Esq., *Admitted pro hac vice*, Hamilton, Miller & Birthisel LLP, 150 Southeast Second Avenue, Suite 1200, Miami, FL 33131-2332, ssmith@hamiltonmillerlaw.com, jnakoa@hamiltonmillerlaw.com, caitlinsclarke@gmail.com, bsilverman@hamiltonmillerlaw.com djones@hamiltonmillerlaw.com, tcesarano@hamiltonmillerlaw.com (*Attorney for*

*Defendants)*

/s/ Francis M. McDonald, Jr.

FRANCIS M. MCDONALD, JR., ESQ.
Florida Bar No. 032709
SARAH A. LONG, ESQ.
Florida Bar No. 0080543
MCDONALD TOOLE WIGGINS, P.A.
111 N. Magnolia Avenue, Suite 1200
Orlando, FL 32801
Telephone: (407) 246-1800
Facsimile: (407) 246-1895
fmcdonald@mtwlegal.com
slong@mtwlegal.com

*Attorneys for Defendants, BP Exploration &
Production Inc. & BP America Production
Company*